# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JO ANN WILKERSON**, | |
| Plaintiff, | |
| v. | Case No. 1:16-cv-00909 (TNM) |
| **MARTIN J. GRUENBERG,** in his official capacity as Chairman, Federal Deposit Insurance Corporation, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Jo Ann Wilkerson claims that her former employer, the Federal Deposit Insurance Corporation ("FDIC"), discriminated against her on the basis of her race, sex, and age, and requests relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Age Discrimination in Employment Act, 29 U.S.C. § 633a. Am. Compl. ¶ 1, ECF No. 10. The FDIC moved for summary judgment. Upon consideration of the pleadings, relevant law, related legal memoranda in opposition and in support, and the entire record, the Court finds that no genuine issue of material fact exists and that the FDIC articulated legitimate, non-discrimination reasons for its actions, which Ms. Wilkerson has not rebutted as pretextual. Accordingly, the Defendant's motion for summary judgment will be granted.

# I. BACKGROUND

## A. Ms. Wilkerson's Employment at the FDIC

Ms. Wilkerson is a 58 year old,[1] African-American woman who served as a Senior Community Affairs Specialist within the FDIC's Outreach and Program Development Section (the "Section"). *Id.* ¶ 5. She held this role, a CG-15 level position, as a term employee for four years, between February 2011 and February 2015. *Id.* ¶ 8. Ms. Wilkerson describes her responsibilities to include "conduct[ing] research on community development issues of concern to financial institutions, and [] develop[ing] educational/outreach material to help facilitate bank investment in economic and community development projects." *Id.* One of the educational materials on which she worked was a handbook called "Strategies for Community Banks to Develop Partnerships with Community Development Financial Institutions" (the "CDFI Guide"). *See id.* ¶¶ 9, 10(i).

Throughout her tenure at the FDIC, Ms. Wilkerson's first-level supervisor was Section Chief Luke Reynolds, who Ms. Wilkerson characterizes as "a white male in his late 30s." *Id.* ¶ 8. For most of her tenure, Ms. Wilkerson's second-level supervisor was Elizabeth Ortiz, Deputy Director of the FDIC's Division of Depositor and Consumer Protection, but Janet Gordon, Associate Director of the Section, became her second-level supervisor for the last nine months of her term (*i.e.*, June 2014 to February 2015). Def.'s Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s SOMF") ¶¶ 4-5, ECF No. 17.[2]

---

[1] As of the time of her Amended Complaint.

[2] Unless otherwise noted, all citations to the Defendant's Statement of Material Facts as to Which There is No Genuine Dispute reflect facts undisputed by Ms. Wilkerson.

## B. Ms. Wilkerson's Complaint – Discrimination Claims

Ms. Wilkerson alleges that the FDIC discriminated against her on the basis of her race, sex, and age, particularly as compared to a "younger white male colleague," James Yagley, who held the same position as Ms. Wilkerson and was another of Mr. Reynolds' direct reports. Am. Compl. ¶ 9. Her discrimination claims fall into three categories.

First, Ms. Wilkerson claims that in the time leading up to November 2014, she received disparate treatment than Mr. Yagley, such as: (i) being told that she was not permitted to travel to meetings and conferences as a term employee; (ii) being denied access to certain shared electronic resources (e.g., computer drive, Community Affairs folder, CARDs system); (iii) not being given a laptop; (iv) not being provided opportunities to present at meetings of the Regional Community Affairs Officers or moderate national webinars; (v) not being able to attend the meetings of the FDIC Chairperson's Advisory Committee of Economic Inclusion; and (vi) being denied attendance at the Community Reinvestment Act training held in March 2012 and the FDIC's Examination School for Non-Examiners held in February 2015. *Id.* ¶ 10.[3] She also alleges that her performance rating of "III – Accomplished Practitioner" on her 2013 performance evaluation was lower than she previously received. *Id.*

Second, Ms. Wilkerson argues that her 2014 performance evaluation, where she received a "III – Accomplished Practitioner," was lower than she deserved vis-à-vis Mr. Yagley's performance that year, for which he was rated a "IV." *Id.* ¶ 9; Mot. for Summ. J. Ex. 4 (Aff. of Luke Reynolds) at 9, ECF No. 17-2. The 2014 evaluation period covered September 2013 to

---

[3] Ms. Wilkerson labels these events in ten sub-parts, but for clarity and brevity, the alleged actions have been summarized and similar actions have been categorized together.

August 2014, and was delivered to Ms. Wilkerson in November 2014.  *Id.* Ex. 3, ECF No. 17-2; Am. Compl. ¶ 9.

Third, Ms. Wilkerson claims that her work in 2014 on the CDFI Guide deserved a monetary award since Mr. Yagley received "substantial cash awards for much less important work" at the FDIC.  *Id.* ¶¶ 9-10.

### C.  Ms. Wilkerson's Complaint – Retaliation Claims

Approximately a week before her term at the FDIC concluded, Ms. Wilkerson filed a formal complaint of discrimination with the FDIC's Office of Minority and Women Inclusion. *Id.* ¶ 11.  A few days later, she applied to be a permanent Community Affairs Specialist at either the Lexington, Kentucky or Raleigh, North Carolina positions, both CG-13 level postings.  *Id.* ¶ 13.  Ms. Wilkerson conducted two rounds of interviews for the positions, but was not selected for either.  *Id.* ¶¶ 13-14.  She claims that her second-level supervisor, Ms. Gordon, was aware of her discrimination complaint and retaliated against her by not selecting Ms. Wilkerson for either position.  *Id.* ¶14.

## II.     LEGAL STANDARD

To prevail on summary judgment, the movant must show an absence of a genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact is one that would change the outcome of the litigation.  *Anderson*, 477 U.S. at 248.  The Court views the evidence in the light most favorable to the non-moving party.  *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

Discrimination and retaliation claims are evaluated under the framework explained in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a *prima facie* case; the burden then shifts to the employer to "articulate a legitimate, non[-]discriminatory and/or non-retaliatory reason for the adverse employment action;" whereupon the burden shifts back to the plaintiff to "demonstrate that the offered non-discriminatory reason was, in fact, pretext for a prohibited reason." *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 70 (D.D.C. 2015). In this Circuit, at the summary judgment stage, a court need not decide whether the plaintiff actually made a *prima facie* case under *McDonnell Douglas*. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). The central inquiry is whether the employee has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin." *Id.* To answer this, the court considers the "total circumstances of the case," including "any evidence the plaintiff presents to attack the employer's proffered explanation for its actions, and [] any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013).

## III.    ANALYSIS

Each of Ms. Wilkerson's claims fail as a matter of law because she has not presented sufficient evidence to demonstrate that the FDIC's articulated, non-discriminatory and non-retaliatory reasons for its actions are pretext for discrimination.

### A. Discrimination Claims

#### 1. Disparate Treatment

Each of Ms. Wilkerson's allegations of disparate treatment has been met by the FDIC with a legitimate, non-discriminatory reason for the action, which Ms. Wilkerson has not shown to be pretextual. With respect to her claim that she was not permitted to travel to meetings and conferences as a term employee unlike Mr. Yagley, the FDIC asserts that Ms. Wilkerson was not told that she could not travel, but rather that she was ineligible for a Professional Learning Account as a term employee. Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Mot. for Summ. J.") 17, ECF No. 17-1. The account provides funds to FDIC employees for external training opportunities. *Id.* As term employees, neither Ms. Wilkerson nor Mr. Yagley were eligible for these funds. *Id.* at 18. Term employees, however, were eligible to travel to meetings and conferences for work-related purposes, which Mr. Yagley did for certain of his assignments, and, in fact, Ms. Wilkerson did too. *Id.*; Opp. to Mot. for Summ. J. Ex. 9 (Pl.'s Answers to Def.'s Interrogs.) at 48, ECF No. 20-9 (Ms. Wilkerson stating that she participated in four meetings that involved travel). Though she alleges that Mr. Yagley was afforded more travel opportunities than she was, Ms. Wilkerson has not rebutted the FDIC's explanation that his travel was work-related or—more importantly—demonstrated that she had fewer or was denied travel opportunities because of her race, sex, or age. Her self-serving allegation that race, sex, and/or age motivated the apparently discrepant decisions does not suffice. *See Mokhtar*, 83 F. Supp. 3d at 61 ("Summary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements" because these "do not create genuine issues of material fact.") (internal quotation marks omitted).

The record also shows that Ms. Wilkerson was granted access to the electronic resources that she complains that she did not receive as quickly as Mr. Yagley. Mot. for Summ. J. Ex. 36 (email from Mr. Reynolds requesting information technology support provide Ms. Wilkerson with "full access" to the Community Affairs Folder); *id.* Ex. 37 (email from Ms. Wilkerson to Mr. Reynolds confirming that she was granted access to CARDs). Ms. Wilkerson offers no evidence that these resources were denied or delayed to her on account of her race, sex, and/or age, and, in any event, it is not clear that delayed access is sufficient to establish that Ms. Wilkerson suffered an adverse action. *See Huang v. Wheeler*, 215 F. Supp. 3d 100, 110 (D.D.C. 2016) (dismissing a claim alleging discrimination for denying sick leave that was eventually granted); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1195 (D.C. Cir. 2008) (affirming the grant of summary judgment to the Government because the plaintiff failed to show that he suffered an adverse action).

With respect to being provided a laptop computer, the FDIC asserts that laptops were reserved for employees who regularly traveled, and that Mr. Reynolds was not involved in approving or obtaining a laptop for Mr. Yagley. Mot. for Summ. J. 20. The record does not indicate who requested or approved for Mr. Yagley to receive a laptop, much less that the decision was made on a discriminatory basis between Mr. Yagley and Ms. Wilkerson. In response, Ms. Wilkerson does not offer evidence to show that the FDIC's proffered legitimate reason was pretextual, but asks the Court to infer it merely from her statement that Mr. Yagley was given a laptop from the start of his employment while she was not. *See* Opp. to Mot. for Summ. J. Ex. 12 (Dep. of Jo Ann Wilkerson) 109:14-22, ECF No. 20-12; Opp. to Mot. for Summ. J. 4, ECF No. 20.

Ms. Wilkerson also claims that she was not provided the same opportunities as Mr. Yagley to present at the quarterly meetings of the Regional Community Affairs Officers or to moderate webinars. Am. Compl. ¶¶ 10c, i. In response, the FDIC states that Mr. Yagley attended some of the quarterly meetings because part of his role was to evaluate one of their initiatives. Mot. for Summ. J. 20. The particular webinar that Ms. Wilkerson sought to moderate was instead moderated by Ms. Ortiz, the Deputy Director of the Division of Depositor and Consumer Protection. *Id.* Ex. 10 (Dep. of Luke Reynolds) 204-05, ECF No. 17-2. The Court detects no invidious discrimination in a manager's desire to moderate a webinar that Ms. Wilkerson herself describes as an important FDIC product. *See* Mot. in Opp. for Summ. J. 12-13. These reasons—which are business decisions unrelated to Ms. Wilkerson's race, sex, or age—have not been shown to be pretextual.

Ms. Wilkerson also quarrels with not being permitted to attend the meetings of the FDIC Chairperson's Advisory Committee of Economic Inclusion. Am. Compl. ¶ 10f. Mr. Reynolds explained that this was due to space constraints, but that an overflow room was later opened to permit FDIC staff to attend. Mot. for Summ. J. 20-21. The record does not indicate whether Ms. Wilkerson later attended the meetings via the overflow room or through a live feed on her computer. *See id.* at 21; Opp. to Mot. for Summ. J. Ex. 9 at 49 (Ms. Wilkerson stating that the meeting could be watched via a live stream on the FDIC's website). It is also not clear whether these meetings were always available to watch via a live stream, and thus Ms. Wilkerson's true objection is being unable to attend in person. In any event, none of these outstanding questions present a genuine issue of material fact and Ms. Wilkerson has not adequately demonstrated that her absence from these meetings was motivated by her race, sex, or age.

The same is true for her dispute with being denied participation in the FDIC's

Community Reinvestment Act ("CRA") training and the Examination School for Non-

Examiners.  Mr. Reynolds testified that none of his staff attended the CRA training because the

course was "specifically for examiners."  Mot. for Summ. J. Ex. 10 (Dep. of Luke Reynolds)

202:7-12.  With respect to the Examination School, Mr. Reynolds explained that

Ms. Wilkerson's participation was denied because her term was scheduled to end the same

month as the training, and it did not make sense for the FDIC to pay for this training under these

circumstances.  Mot. for Summ. J. 21.  Ms. Wilkerson has not offered any evidence to rebut this

legitimate, non-discriminatory explanation.  Furthermore, she has identified no evidence that

Mr. Yagley participated in either of these trainings.  *See* Opp. to Mot. for Summ. J. 5.

Last, Ms. Wilkerson alleges that her score of "III – Accomplished Practitioner" during

her 2013 performance evaluation was "significant[ly] lower than the rating she had previously

received."  Am. Compl. ¶ 10h.  However, she does not allege that her evaluation was due to

illegitimate reasons, but merely states that she was "undeserving" of the lower rating.  *See id*.

For this perfunctory and conclusory claim, Ms. Wilkerson has not made out a *prima facie* case,

and no genuine issue of material fact exists.  *See Teneyck v. Omni Shoreham Hotel*, 365 F.3d

1139, 1150 (D.C. Cir. 2004) (articulating the elements of a *prima facie* case as (1) being a

member of a protected class, (2) suffering an adverse employment action, and (3) the

unfavorable action giving rise to an inference of discrimination); *see also Douglas v. Donovan*,

559 F.3d 549, 553 (D.C. Cir. 2009) (explaining that for employment actions such as giving a

poor performance valuation, a plaintiff must demonstrate how the decision caused an

"objectively tangible harm.").

In sum, Ms. Wilkerson's complaints at most amount to "run-of-the-mill workplace annoyances" that do not rise to the level of "materially adverse consequences affecting the terms, conditions, or privileges of employment such that a reasonable trier of fact could find objectively tangible harm." *See Hinds v. Mulvaney*, 296 F. Supp. 3d 220, 235, 245 (D.D.C. 2018). This is legally insufficient to establish a *prima facie* case. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002). But independent of her failure to establish a *prima facie* case, which under controlling precedent does not have to be decided at the summary judgment stage, *see Brady*, 520 F.3d at 494, she has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" for invidious reasons. *See id.*

### 2. 2014 Performance Evaluation

Ms. Wilkerson's central complaint is about her 2014 performance evaluation, on which she received a rating of "III – Accomplished Practitioner." She claims that this rating was discriminatory because it was lower than Ms. Yagley's, who received a "IV – Performance Leader," and harmed her by affecting her pay increase as well as making her less competitive for a permanent position with the FDIC and other organizations. Am. Compl. ¶ 9.

The FDIC explained that the difference between Ms. Wilkerson's and Mr. Yagley's overall scores came down to each's rating in one of four "Job Standards," "Demonstrates Technical Knowledge of the Program Area," for which Ms. Wilkerson received a "3" and Mr. Yagley received a "4." Mot. for Summ. J. 14.[4] The differentiators between a "3" and a "4"

---

[4] An employee is evaluated on four "Job Standards" ("Applies Communication Skills," "Organizes and Manages Projects," "Demonstrates Technical Knowledge of Program Area," and "Performs Research and Analysis") and four "Behavioral Standards" ("Judgment," "Flexibility,"

for this standard are that the employee "[a]pplies technical knowledge in an independent and accurate manner to complete non-routine tasks" and "[s]eeks opportunities to share technical knowledge and skills outside of the immediate work group." Mot. for Summ. J. 14.

Mr. Reynolds explained that Mr. Yagley met both of these criteria, and provided concrete examples of him doing so. Mot. for Summ. J. Ex. 4 at 10-11 (citing examples where Mr. Yagley led a Community Affairs Branch small business working group without being assigned to do so; set up a new "structured approach to goal setting" within a "signature FDIC initiative;" and being "heavily involved" in a strategic plan that was a Divisional Goal for 2013 and 2014). Mr. Reynolds also described how and why he assessed Ms. Wilkersons's accomplishments to be "routine" and therefore did not meet the requirements for a "4" rating. *See id*. at 11 (explaining that, in comparing Ms. Wilkerson's work completed on the CDFI Guide for 2014 to work completed in 2013, the changes made were "very modest" and mostly in style, not substance; and that her developing other agendas and presentations were "routine" for the Section and largely involved transferring information from the CDFI Guide into other formats). This legitimate and non-discriminatory explanation for Ms. Wilkerson's rating shifts the burden back to her to "demonstrate that the offered non-discriminatory reason was, in fact, pretext for a prohibited reason." *See Mokhtar*, 83 F. Supp. 3d at 70.

Ms. Wilkerson makes a number of unavailing arguments to attempt to show that Mr. Reynolds' explanation of her evaluation was pretext. First, she argues that Mr. Reynolds removed positive comments from her final evaluation about her interactions with an external group, the Independent Community Bankers of America, which would have substantiated a "4"

---

"Teamwork and Collaboration," and "Accountability for Performance"). These are combined to form an overall performance rating. *Id.* Ex. 3.

rating in the "Demonstrated Technical Knowledge of Program Area" standard and elevated Ms. Wilkerson's overall rating to a "IV." Opp. to Mot. for Summ. J. 6. Second, she points out that Mr. Reynolds, in an initial draft of her evaluation, rated her as a "V" overall, only to reduce his evaluation to a "III" after consulting with his first and second-line supervisors, Ms. Gordon and Ms. Ortiz. *Id.* at 7-8. Third, Ms. Wilkerson claims that Mr. Reynolds told her that she would have received a higher rating if she "knew more people outside FDIC," but that she was consistently denied the opportunity to share her work with those outside of her work group. *Id.* Fourth, she argues that Mr. Reynolds' alleged "shift in explanation" for her rating—first telling her that she needed to know others outside of the FDIC and later writing that she only made "relatively modest" updates to the CDFI Guide—meets her burden to demonstrate an illicit motive. *See id.* at 19-20. Last, she alleges that Mr. Yagley was undeserving of his higher rating and that Mr. Reynolds' explanation for his rating is "full of embellishment and exaggeration." *Id.* at 9-10, 20. None of the evidence or arguments presented, however, successfully carries her burden to show that Mr. Reynolds' actions were motivated by discrimination.

As to her first argument, the record shows that Mr. Reynolds' initial draft rated Ms. Wilkerson as a "3" in "Demonstrated Technical Knowledge of Program Area," which remained unchanged between the initial draft and final version. *Compare* Opp. to Mot. for Summ. J. Ex. 6 (initial draft), ECF No. 20-6 *with* Mot. for Summ. J. Ex. 3 (final version), ECF No. 17-2. The record also shows that—contrary to Ms. Wilkerson's claim—both the initial and final versions recognized her work in "buil[ding] relationships with organizations such as [Independent Community Bankers of America] to help them know about the guide and formulated and pursued ideas how to maximize the potential return of the ICBA relationship for

the guide." *See id.* This evidence does not assist in rebutting the presumption that her evaluation was made in a non-discriminatory manner.

As to Ms. Wilkerson's second argument, it appears that Mr. Reynolds did initially rate Ms. Wilkerson as a "V" overall. Opp. to Mot. for Summ. J. Ex. 6. He sent this initial draft, along with initial drafts for others that he supervised, *id.*, to Ms. Gordon, who responded that she would need explanations for any ratings that were higher than their mid-year ratings. *Id.* Ex. 2 (Dep. of Janet Gordon) 80:3-12, ECF No. 20-2. Mr. Reynolds replied that everyone on his team at mid-year were "IIIs" but that he felt that "these are the appropriate year-ends." *Id.* at 81:4-9.[5] Ms. Gordon challenged these designations, stating, "Okay. But some of these team members do not strike me as producing [V] level work without significant coaching and guidance, which is not really what the role model or performance leader is for." *Id.* at 81:21-82:12. Ms. Ortiz similarly provided feedback to Mr. Reynolds that he was "not adhering to the [rating] standard[s]" and that he "was not applying the standards correctly." Reply in Supp. of Mot. for Summ. J. Ex. 52 (Dep. of Luke Reynolds) 152:11-16.

In the end, Mr. Reynolds delivered a performance review to Ms. Wilkerson rating her as a "3" across all standards and a "III" overall. Mot. for Summ. J. Ex. 3. One of the standards, "Applies Communication Skills," was later upgraded from a "3" to a "4" after Ms. Wilkerson

_____

[5] In her opposition to the FDIC's motion for summary judgment, Ms. Wilkerson raises, for the first time and in three sentences, that Mr. Reynolds had a "pattern of rating his female minority subordinates lower than his white male employees." *See* Opp. to Mot. for Summ. J. 11. Ms. Wilkerson claims that four other individuals received lower ratings, but the evidence contradicts her bare allegation and does not meet her burden to show that a reasonable juror could infer discriminatory intent. *See* Reply in Supp. of Mot. for Summ. J. 7-8 (explaining that Ms. Wilkerson was not similarly situated to one comparator because, for the evaluation year at issue, Ms. Wilkerson received a "V" and the comparator received a "III" or "IV"; another comparator who received a "III" self-rated herself the same; the third comparator ultimately received a "V" for her 2009 evaluation; and the fourth did not earn high enough component scores to propel her total score above a "III.").

successfully sought reconsideration from Mr. Reynolds and Ms. Ortiz, but this left her overall rating unchanged. *See* Opp. to Mot. for Summ. J. Ex. 10, ECF No. 20-10. Although this evidence shows that Mr. Reynolds did downward adjust Ms. Wilkerson's scores, notably absent is any indication that Mr. Reynolds adjusted, or was directed by his supervisor to adjust, Ms. Wilkerson's evaluation due to discrimination. Indeed, Mr. Reynolds' initial instinct to rate Ms. Wilkerson at the top of the performance scale undermines any suggestion of invidious discrimination on his part. And Ms. Wilkerson points to no evidence indicating that Mr. Reynolds' supervisors provided input on Ms. Wilkerson's evaluation specifically. *See* Reply in Supp. of Mot. for Summ. J. 10, ECF No. 21. Rather, Mr. Reynolds' supervisors assessed that he incorrectly applied the evaluation standards for a number of his subordinates. This feedback was appropriate and within the scope of their roles to guide the evaluation process, including calibrating the process across all subordinates. The mere fact that Ms. Wilkerson's overall score changed during this process is insufficient evidence for a reasonable jury to find that the change was due to discrimination.

Third, the Court has already addressed Ms. Wilkerson's claims about her attendance at meetings, conferences, and trainings, *see supra* Section III.A.1., and found that none exhibited any discriminatory motive. *See* Opp. to Mot. for Summ. J. 19 (arguing that Mr. Reynolds' statement that her rating would be higher if she "knew more people outside FDIC" is pretext given that she was allegedly improperly excluded from meetings, conferences, and trainings).

Ms. Wilkerson's fourth argument that Mr. Reynolds' "shift in explanation" demonstrates pretext is similarly ineffective because the record contains no indication that Ms. Wilkerson's evaluation was made or communicated to her as being wholly based on a single reason, or that Mr. Reynolds jumped from one rationale to another in a superficial effort to substantiate his

decision.  *See Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (explaining that "shifting and inconsistent justifications are probative of pretext.").  Ms. Wilkerson claims that Mr. Reynolds' "first explanation" for her evaluation was that she needed to know "more people outside FDIC" and that his "second explanation" that she only made "relatively modest" updates to the CDFI Guide during the evaluation year constitutes sufficient evidence for a reasonable jury to conclude pretext.  Opp. to Mot. for Summ. J. 19.  To start, only Ms. Wilkerson's self-serving declaration that Mr. Reynolds made the statement about knowing people outside of the FDIC supports it.  *See* Reply in Supp. of Mot. for Summ. J. 3.  Even assuming Mr. Reynolds made the statement, his affidavit makes clear that it would have been one of many comments and considerations in evaluating Ms. Wilkerson's performance.  *See id.*; *see also* Mot. for Summ. J. Ex. 4 at 7-11 (explaining his rationale for her ratings and giving examples for the "Applies Communication Skills," "Judgment," and "Demonstrates Technical Knowledge of Program Area" standards).  Given that employees are rated on four "Job Standards" in addition to four "Behavioral Standards," all combining to create an overall rating, it follows that an employee's rating would be influenced by multiple factors and inputs.  Mr. Reynolds' statements about his rationale for Ms. Wilkerson's rating—that she should seek more external opportunities and that her majority of her work on the successful CDFI Guide was completed in a prior evaluation year—thus do not conflict, nor are they shifting.  This is insufficient to demonstrate pretext.  *Cf. Geleta*, 645 F.3d at 413 (finding that a reasonable jury could determine pretext where the defendant transferred the plaintiff to another job and the evidence showed that the reason for the transfer was "not performance, you know, it's just—whatever reason you feel—whatever you're comfortable with" but later explained as pertaining to business reasons).

Last, although Ms. Wilkerson strenuously asserts that Mr. Yagley's evaluation was undeserved and "full of embellishment and exaggeration," she fails to demonstrate that his rating was inflated and that the alleged inflation was due to his race, sex, or age.  Each of Mr. Yagley's ratings is supported by contemporaneous justifications, and each is consistent with Mr. Reynolds' explanations as to what distinguishes a "III" from a "IV" rating.  *See* Mot. for Summ. J. Ex. 27 at 2-3, ECF No. 17-4; *id.* Ex. 4 at 5-11.  That she disagrees with the outcome is insufficient to defeat summary judgment.  *See Ficken v. Clinton*, 771 F. Supp. 2d 79, 84 (D.D.C. 2011) ("[A] plaintiff's personal evaluation of [her] own qualifications and performance is insufficient to rebut a defendant's legitimate, non-discriminatory reason for [the action]").

Similarly, Ms. Wilkerson's assertion that Mr. Reynolds considered Mr. Yagley's performance in previous years in his 2014 evaluation while not considering her past performance, Opp. to Mot. for Summ. J. 10, is contradicted by the record.  Mr. Reynolds stated that Mr. Yagley "was deeply involved *during the rating year* in working with several AEIs [Alliance for Economic Inclusion programs] to conduct self assessments and improvement plans," which "involved him spending a considerable amount of time mentoring staff in those regions on how to clarify goals and outcomes, developing realistic timeframes for achieving goals . . . and on written communications."  Mot. for Summ. J. Ex. 4 at 10 (emphasis added).  These tasks, among others that Mr. Reynolds highlighted to support Mr. Yagley's rating, were "non-routine for anyone in the Section to do."  *Id*. at 10-11.  The record supports the agency's legitimate, non-discriminatory reasons to rate Mr. Yagley as a "IV" and Ms. Wilkerson has not identified any evidence to rebut this presumption.

### 3. 2014 Monetary Award

Ms. Wilkerson also disputes not being awarded a Mission Achievement Award for her work on the CDFI Guide during the 2014 evaluation cycle and contends that "the young, white Mr. Yagley received substantial cash awards for much less important work during his tenure at FDIC." Opp. to Mot. for Summ. J. 12. Mr. Reynolds explained that this award is "based on the extent of an employee's contribution to the accomplishment of either corporate or division goals and objectives" and that the Guide was a Section goal, but not a corporate or divisional goal. Mot. for Summ. J. Ex. 4 at 4. Employees are recognized for assisting with Section goals through the routine performance evaluation process. *Id*. Mr. Reynolds also noted that "Divisional leadership has on several occasions reminded me and the other managers in the Division of their expectation that we be familiar with and adhere to the rules [for the awards programs]." *Id*. Ms. Ortiz testified that these awards are "generally very hard to get" and that "[m]any good things get done in the Agency that do not get recognized with a [Mission Achievement Award]." *Id*. Ex. 9 at 3. In response, Ms. Wilkerson emphasizes the success of the Guide and argues that it furthers the mission of the FDIC, and that "it is simply not believable that Mr. Reynolds did not think the guide advanced an FDIC goal." Opp. to Mot. for Summ. J. 21. But this does not meet Ms. Wilkerson's burden to show that a reasonable juror could infer discriminatory intent from not granting her a cash award for her work on the Guide.

The Division's goals, which are documented, describe five thematic goals and articulate specific and measurable actions to achieve each. Reply in Supp. of Mot. for Summ. J. Ex. 44, ECF No. 21-1. For example, for the goal to "promote economic inclusion to enhance public confidence in the banking system," the Division aimed to "plan and hold two meetings of the Advisory Committee on Economic Inclusion," to hold "over 100 events" with community banks

and stakeholders, to host a research symposium, and to monitor and research certain policy proposals. *Id.* at 1-2. It is undisputed that Ms. Wilkerson's work on the Guide was well regarded and Mr. Reynolds praised her for this work in her performance review. Mot. for Summ. J. Ex. 3 at 2-3. But it is both possible to do one's job well and yet not be recognized beyond the ordinary performance evaluation process. In fact, Mr. Yagley did not receive a Mission Achievement Award for his work either. *Id.* Ex. 41. Mr. Reynolds' assessment that Ms. Wilkerson's work on the Guide was not one of the pre-set specific divisional or corporate goals does not raise an inference that he thought so due to her race, sex, or age, and no reasonable juror could find as such. Ms. Wilkerson's attempted comparison to Mr. Yagley also fails, for the record shows that Mr. Yagley received one award for the 2014 performance year, a STAR Award of $250 for assisting at a training conference, just like Ms. Wilkerson. Mot. for Summ. J. Ex. 4 at 4.

## B. Retaliation Claims

Ms. Wilkerson alleges that Ms. Gordon, her second-level supervisor, retaliated against her filing a discrimination complaint with the FDIC Office of Minority and Women Inclusion by not hiring her for one of two permanent Community Affairs Specialist positions that Ms. Wilkerson interviewed for. Am. Compl. ¶¶ 11-14. But the FDIC has offered legitimate, non-discriminatory reasons for her non-selection, and no reasonable jury could infer discrimination from the evidence presented.

The FDIC explains that Ms. Wilkerson conducted two rounds of interviews for the position, both panel interviews. Mot. for Summ. J. 25. The second panel consisted of Ms. Gordon and the first-line supervisors for the Lexington and Raleigh positions, the two positions to which Ms. Wilkerson applied. *Id.* After the second interview, the supervisors

submitted memoranda to Ms. Gordon with their recommendation and rationale. *Id.* The supervisor for the Lexington position, Ms. Harris, recommended James Davis, who she commended for his "specific knowledge of the Lexington market and Kentucky territory." *Id.* at 25-26. The supervisor for the Raleigh position, Mr. Stokes, recommended Victor Galloway, who understood "the FDIC community affairs program and the banking industry and community stakeholders' roles in community development." *Id.* Both Ms. Harris and Mr. Stokes selected an alternative, neither of whom was Ms. Wilkerson. *Id.* at 26. Ms. Gordon accepted the recommendations and selected Messrs. Davis and Galloway for the positions. *Id.* This contemporaneous documentation shows a legitimate, non-discriminatory reason for the selection of individuals other than Ms. Wilkerson.

Ms. Wilkerson argues that a reasonable jury could infer discriminatory intent both from Ms. Gordon's alleged dishonesty about remembering Ms. Wilkerson's challenge to her 2014 performance valuation,[6] and by rejecting her explanation for Ms. Wilkerson's non-selection as being banking experience-related. Opp. to Mot. for Summ. J. 22-23. Neither argument is persuasive. That Ms. Gordon disclaimed remembering Ms. Wilkerson seeking re-consideration of her 2014 performance evaluation does not in this instance rise to the level of showing "a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 148 (2000). To begin, there was no indication in Ms. Wilkerson's email to Ms. Ortiz and Mr. Reynolds seeking reconsideration of her 2014 performance ratings that she was alleging unlawful discrimination. *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) ("While no 'magic words' are required, the complaint must in some way allege

---

[6] In response to whether Ms. Gordon was aware that Ms. Wilkerson "appealed her performance rating in 2014 to Ms. Ortiz," Ms. Gordon responded, "I was not aware or I don't remember being aware." Opp. to Mot. for Summ. J. Ex. 2 at 101:3-5, 18-19.

unlawful discrimination, not just frustrated ambition.").  This is supported by the fact that the Amended Complaint only alleges retaliation from filing an EEO complaint, not from challenging her 2014 performance evaluation.  *See* Am. Compl. ¶¶ 11-14.

Additionally, Ms. Gordon's testimony was that she "was not aware or [doesn't] remember being aware" is hardly surprising given that there is only one email in the record in which Ms. Ortiz writes to Ms. Gordon to give her a "heads up re: one change (jo ann)" and Ms. Gordon was responsible for reviewing more than 30 performance evaluations for other personnel that period, none of which included Mr. Reynolds' direct reports.   Opp. to Mot. for Summ. J. Ex. 2 at 101:3-5, 18-19; *id.* Ex. 10; Mot. for Summ. J. Ex. 9 (Aff. of Janet Gordon) at 4, ECF No. 17-2, *id.* Ex. 40 (Dep. of Janet Gordon) 65:11-15, ECF No. 17-5.  Under these circumstances, it is not exceptional nor does it create a genuine issue of material fact for Ms. Gordon not to recall remembering one aspect of a performance evaluation for a single employee not at the time in her review purview that took place over two and a half years ago. Last, Ms. Gordon's hiring decision rested on the recommendations of the two first-line supervisors overseeing the positions, and Ms. Wilkerson does not allege or present evidence that Ms. Gordon improperly influenced the recommendations.  *See* Mot. for Summ. J. Ex. 9 at 7 ("I did not instruct Ms. Harris or Mr. Stokes not to recommend [Ms. Wilkerson] for the vacancy in their region.").

Put slightly differently, Ms. Wilkerson has not shown that her re-consideration request for her 2014 performance valuation was a protected activity, and even if it was, that there was a causal connection between the protected activity and the adverse personnel action.  *See Youssef v. Holder*, 19 F. Supp. 3d 167, 199 (D.D.C. 2014) (reciting the elements of retaliation as (1) engaging in a statutorily protected activity, (2) being the subject of an adverse personnel

action, and (3) a causal connection existing between the two). She also fails to establish a causal connection between her EEO complaint and the hiring decision. She alleges, without more, that "[w]ithout doubt, Ms. Wilkerson's second level supervisor, Janet Gordon, . . . was informed of Ms. Wilkerson's EEO claims concerning the mistreatment . . . by her subordinate Luke Reynolds." Am. Compl. ¶ 11. But Ms. Wilkerson identifies no evidence in the record to support this unadorned allegation. The EEO Counselor's Report dated March 3, 2015—*i.e.*, after Ms. Wilkerson's term at the FDIC ended—shows that the Counselor spoke with Mr. Reynolds about the complaint, but there is no indication that Ms. Gordon was aware of the complaint, much less that it played a role in the hiring decision. *See* Opp. to Mot. for Summ. J. Ex. 1, ECF No. 20-1.

Ms. Wilkerson further contends that Ms. Gordon's reliance on criteria not listed in the vacancy announcement to select among candidates is sufficient to support an inference of pretext. Opp. to Mot. for Summ. J. 23. She asserts that Ms. Gordon's explanation that she and the panel were "most interested in learning from each candidate about their collaborations involving bankers and community leaders" and that banking knowledge was "particularly emphasized" was not stated in the vacancy announcement, and this deviation is evidence from which a jury could infer pretext. *Id.* However, the vacancy announcement and Ms. Gordon's explanation are not incongruent. The announcement stated that the position would "[e]ngage[] in pro-active communication with community-based organizations, academic researchers, government officials, bankers and other lenders" and to "[r]epresent[] the FDIC as speaker or participant as designated, at events designed to educate financial institutions, community representatives and others." Mot. for Summ. J. Ex. 8, ECF No. 17-2. These written descriptions

are consistent with Ms. Gordon's explanation and fail to raise a genuine issue of material fact sufficient to withstand summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment will be granted.  A separate order will issue.

Dated: July 12, 2018

TREVOR N. MCFADDEN
United States District Judge